## Case No. 8,170.

### LEAVITT et al. v. CONNECTICUT PEAT CO.

[6 Blatchf. 139.] [1]

Circuit Court. D. Connecticut. June 1, 1868.

NOTES—CONSIDERATION—VALUE OF PATENT—CONTRACT — CONDITIONAL GUARANTIES — CORPORATIONS—BY-LAWS—PROPER OFFICER TO ENDORSE NEGOTIABLE PAPER.

1. What is sufficient value, in letters patent for a machine for condensing and moulding peat into convenient blocks for fuel, to constitute a consideration to support a contract in reference to the use of machines made according to the patent, discussed.

2. What amounts to an acceptance of the fulfilment of conditional guaranties and promises contained in a contract, discussed.

3. Where the by-laws of a corporation required the endorsement of its secretary on a promissory note belonging to it, payable to its order, to pass its title to such note, an endorsement by its president was held not to pass the title, where the endorsee was chargeable with knowledge of the fact that the endorsement was not made by the authority of the corporation.

[Cited in Smith v. Lawson, 18 W. Va. 228.]

This was an action of assumpsit upon two notes held by the plaintiffs [Thomas H. Leavitt and Francis Hunnewell]. One was for the sum of $5,000, drawn by the Tolland County Peat Company, June 27th, 1866, payable to the order of the defendants, four months after date, and purported to be endorsed by the latter. It was payable at the First National Bank of Rockville, and was duly presented, payment refused, and protested. On this note the suit was against the defendants as endorsers. The other note was for the sum of $3,251, drawn by the defendants, and payable to the plaintiffs. On this note the suit was against the defendants as principals. In addition to the counts declaring on these two notes, the declaration contained the common counts in assumpsit. To this declaration the defendants pleaded the general issue, and gave notice of special matter. A stipulation was duly filed, waiving a trial by jury, and the cause was tried by the court. Upon the evidence presented, the court found the following facts: First. That the plaintiffs are citi-

[1] [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]

zens of the state of Massachusetts, residing at Boston, and doing business as partners, under the name of Leavitt & Hunnewell, and that the defendants are a corporation, duly organized under the laws of the state of Connecticut, and located at Hartford, in the latter state. Second. That Thomas H. Leavitt, one of the plaintiffs, was the patentee of a machine for condensing and moulding peat into convenient blocks for fuel, which patent [No. 53,011, granted March 6, 1866] was, prior to the 19th of April, 1866, owned by the plaintiffs. Third. That, on the 19th of April, 1866, the plaintiffs and defendants entered into a written contract, in substance as follows: (a) The plaintiffs agree to convey to the defendants, their heirs, or to whom they or their heirs shall direct or demand, the right to manufacture peat fuel for themselves, their heirs or assigns, by the use of Leavitt's Peat Condensing and Moulding Mill, or sets of machinery, constructed for that purpose, in all the territory embraced in the state of Connecticut, except the counties of Hartford and New Haven, and the towns of New London and Waterford in the county of New London. (b) The plaintiffs agree, further, to convey to the defendants, or to whom their heirs shall direct, on demand, and without further cost or charge to them, all the improvements in the manufacture or in the machinery to manufacture peat fuel, that shall be made by T. H. Leavitt, or of which the plaintiffs shall become possessed, for the territory aforesaid. (c) The plaintiffs agree to furnish condensing and moulding mills of the character named, to the defendants, for the use of the latter, at $600 each, and to the defendants, for sale to others, to be used in said territory, at $400 each, the same to contain all new improvements, at an additional cost not exceeding the cost of constructing each improvement, the defendants in no case to sell to others such mills at a less price than $600 for each. (d) The plaintiffs agree to protect the defendants in the exclusive use of such mills, either by themselves or their assigns, in the territory named. (e) The defendants agree to pay to the plaintiffs "one thousand dollars within ten days after the execution of this instrument, and if, on full and fair trial, to be made within ninety days from the date hereof (April 19, 1866), of a mill or set of machinery, which is now being constructed by the plaintiffs for the defendants, for the manufacture of peat fuel, it shall be found that said mill is capable of turning out forty tons of wet peat per day, yielding, ordinarily, when taken from a well-drained bog, from ten to twelve tons of hard, dry fuel, and will generally accomplish all, or substantially all, which is claimed and set forth in a certain pamphlet, entitled 'Leavitt's Condensing and Moulding Mill for the Manufacture of Peat Fuel,' which statements therein contained are signed 'Leavitt & Hunnewell, agents of the Boston Peat Co.,' then, by the conveyance by the plaintiffs to the defendants, by good and valid deed of assignment, of the territory aforesaid, (and which shall be conveyed on demand,) the defendants shall and will pay to the plaintiffs in cash, or good approved paper on interest, the sum of $11,500, with interest from the date hereof, and will further pay over to the plaintiffs the one-half the cash receipts from the sale of territorial rights hereby agreed to be conveyed, and from the profits accruing from the development of this enterprise, so fast as the same shall be collected, until the plaintiffs shall have been paid the additional sum of $12,500 more." (f) The defendants agree to convey, on demand, to the plaintiffs, the exclusive right, outside of the state of Connecticut, to the use of all improvements in said machine, or in the manufacture of peat, which the defendants shall invent or become possessed of. (g) It is further agreed, mutually, that if, on said trial of said set of machinery, as aforesaid, it shall fail to accomplish substantially the work as claimed for it in the pamphlet above referred to, then, in that event, the plaintiffs will, on demand, refund and pay back the one thousand dollars, paid as stipulated herein, and this agreement shall become void. Fourth. That, among other material representations contained in the pamphlet referred to in the above-named contract, and upon which the defendants relied, was this, that the set of machinery for condensing and moulding peat, referred to therein, was capable of turning out forty tons of wet peat per day, yielding ordinarily, if cut from a well-drained bog, a result of about ten or twelve tons of hard, dry fuel, at a cost, for labor, of less than two dollars per ton. Fifth. That the defendants paid the first installment of $1,000, as provided by said contract, and received from the plaintiffs a set of said machinery, as provided for in said contract, soon after the same was entered into, and proceeded to give it a trial, and that they experimented with it, from time to time, for several months, and down till some time in the month of October, but the machinery failed to turn out forty tons of wet peat per day, when cut from a well-drained bog, capable of making ten or twelve tons of hard, dry fuel, at an expense for labor of less than two dollars per ton; and that, on the contrary, said machine, though worked with adequate power, and under reasonably favorable circumstances, such as the parties in their contract understood to be necessary, proved wholly incapable of accomplishing the above result, both as to the quantity of wet peat produced, and the quantity of hard, dry fuel resulting therefrom, and also as to the expense of production. Sixth. That, though the aforesaid trial of said machine wholly failed to accomplish the results which the plaintiffs represented in their said contract and pamphlet it was capable of performing, said representations were not made by the plaintiffs fraudulently, or with intent to deceive the defendants. Seventh. That the defendants did not, within the ninety days named in said

contract, nor at the expiration thereof, nor at any time, revoke said contract, or demand back the one thousand dollars paid thereon; nor did the defendants, within said ninety days, or at the expiration thereof, or within any reasonable time, notify the plaintiffs that they, the defendants, refused, or should refuse, to complete said contract according to its terms. Eighth. That, on the contrary, the president and secretary of the defendants, on the 13th of July, 1866, delivered to the plaintiffs notes to the amount of seven thousand seven hundred and forty-nine dollars, ($7,749,) as part payment on said contract, upon which notes the plaintiffs subsequently realized cash to their full amount; that the defendants have ratified such payment; and that other payments were made prior to the last-mentioned date, in addition to the first $1,000. Ninth. That, on the 9th of August, 1866, the defendants paid the plaintiffs the further sum of $2,000, in cash, on said contract, and delivered the note for $3,251, embraced in this suit. Tenth. That, on the 9th of August, 1866, there was due to the plaintiffs, on the $12,500 to be paid them absolutely under the contract, in case the trial of the machine, to be made within ninety days, proved satisfactory, as set forth in the contract, the sum of $2,251, and no more; that there was then nothing due to the plaintiffs on account of cash received by them for the sale of territorial rights, or on account of "profits accruing from the development of this enterprise;" that there is nothing now due to the plaintiffs from the defendants on any account whatever, except the said $2,251, with interest thereon; and that the note in suit, for $3,251, was made for that sum through error, and should have been for only $2,251. Eleventh. That the note of $5,000, upon which the defendants are sued in this action as endorsers, was, with several other notes, drawn by third parties, and made payable to the order of the defendants, and endorsed by James H. Ranney, the president of the defendants, and endorsed in no other way; that the said Ranney had no authority from the defendants, either express or implied, to make said endorsement; that the defendants have never ratified such endorsement, and never knew of it until the trial of this case; that said note was received by the plaintiff. Thomas H. Leavitt, from the hands of said Ranney, on the 13th of July, 1866; and that, by the by-laws of the defendants, the secretary alone was authorized to endorse the paper of the company, or that held by them. Twelfth. That, from time to time, in May and June, 1866, the defendants entered into contracts with third parties, underselling territorial rights for parts of the territory embraced in the contract between them and the plaintiffs of April 19th, 1866; and that, on the 13th of August, 1866, the plaintiffs received and accepted from the defendants the conveyance of the territorial right, according to the provisions of the contract of April 19th, 1866. Thirteenth. That, before the execution of said contract of April 19th, 1866, the plaintiffs were, and ever since have been, stockholders of the defendants, the Connecticut Peat Company, and, before said last-mentioned date, and down to the month of December, 1866, the said Thomas H. Leavitt, one of the plaintiffs, was a director of said company. Fourteenth. That, on the trial of said cause, the plaintiffs proved the execution and delivery of said note for $3,251, and the delivery by James H. Ranney of the said note for $5,000, with his endorsement thereon, and that the latter was duly presented for payment, payment refused, and the same duly protested, and then rested their case; that, at a subsequent stage of the trial, and after the defendants had proceeded with their evidence, the plaintiffs further claimed a recovery for two machines, alleged to have been delivered by the plaintiffs to one Lewis, on the order of the defendants; and that, if said delivery of said machines to Lewis was ever made on the order of the defendants, the plaintiffs, before the bringing of this suit, revoked the same, and claimed said two machines as still their own property. Fifteenth. That the consideration of said purchase of the right for the territory named in said contract did not wholly fail; that, though the patent which the plaintiffs sold to the defendants was of small value, yet it was worth something, and, therefore, constituted a valid consideration upon which the contract must be supported; and that, though the plaintiffs greatly overrated the value of their machine and patent, there is not sufficient evidence to support the charge of fraud in the original sale, as set up by the defendants. Sixteenth. That the charge set up by the defendants, that the plaintiffs made other fraudulent representations, such as that they falsely stated that they were in receipt of letters from other parties, assuring them that the machines were working successfully, and performing all that the plaintiffs had promised, and more, is not proven; and that the charge of conspiracy is not proven. Seventeenth. That, though the plaintiffs signed the contract of April 19th, 1866, as agents of the Boston Peat Company, yet the defendants, in fact, dealt with them as principals.

SHIPMAN, District Judge. The transactions out of which this controversy has arisen, had their origin in the facility with which mankind embrace the most delusive schemes for the sudden accumulation of wealth. The community at large, as well as courts of justice, are kept familiar with the fact, that experiments of the most imperfect and inconclusive character are constantly made the basis of extravagant expectations of pecuniary advantage, which are never realized. Men whose good sense, integrity, and sound practical judgment for a long course of years, command the respect and confidence of the community, and the rewards of successful business prudently conducted, are

induced, not unfrequently, to suddenly engage in enterprises based upon untried theories. The imagination becomes inflamed with apparent prospects of boundless wealth; and solid capital, the fruit of hard toil and strict economy, is credulously ventured in the prosecution of schemes which prove as unsubstantial as a dream. The parties awake sooner or later, to find the reality in the presence of the bailiff and in dismal accounts of debts incurred and money gone never to return. The histories of John Law, of the South Sea bubble, of the tulip-mania, and of the morus multicaulus fever, have been written in vain. Each generation has its own El Dorados, wherein it invests a portion of its capital and hopes, and in exploring which it learns, by costly experience, the lessons which recorded examples have failed successfully to teach. The record of past delusions did not prevent one relating to peat from taking possession of not a few minds, as the disclosures of this trial have shown.

It appears, from the evidence, that one of the plaintiffs in this suit, after having made the subject of the preparation of peat for fuel a matter of study and experiment for a considerable time, invented, in 1865, a machine for grinding the article and forming it into blocks or bricks, of convenient size to be dried, handled, and used for fuel. This machine was to be operated by steam power. He put it into operation near a peat meadow or bog, in Lexington, Massachusetts, for the purpose of experimenting and testing its value. He evidently thought it was eminently successful, and obtained a patent for his invention. So well satisfied was he with the result of numerous trials made during the summer and autumn of 1865, that though, as he testified on the stand, the machine could be run, under favorable circumstances, at a net profit of from fifty to one hundred dollars per day, the manufacture of fuel became a matter of minor importance to him individually, and he turned his attention to the sale of rights under his patent and to furnishing machines to others. He expected to realize large gains in the sale of his rights and machines, and no doubt thought that others would share, to some extent, in the profits of what he termed, in one of his letters to the plaintiffs, the "grand movement in peat." In some way he was brought into communication with gentlemen residing in this state, and, by elaborate printed statements, and in other ways, set forth to them the value of his invention. The result was the formation of the Connecticut Peat Company, the defendants in this suit, to whom the territorial right for the patent for the whole state, except the counties of Hartford and New Haven, and the towns of New London and Waterford, was sold for the sum of $25,000, one-half to be paid on a successful trial of the machine, to be made within ninety days, and the other half out of the

cash receipts coming from the sale of territorial rights which the Connecticut Peat Company might sell within the state, or out of profits. In addition to this, the defendants were to have the privilege of purchasing machines of the plaintiffs, for their own use, at $600 each, and for sale to others to use within the state, at $400 each, but were to sell the same only at an advance of $200 or more. Through statements put forth in correspondence, in pamphlets, and in the public journals, by the spring or early summer of 1866, public expectation was raised so high, that rights under the plaintiffs' patent were eagerly sought for. The defendants secured the right for the remaining counties, Hartford and New Haven, at a considerable advance in price over what the plaintiffs had sold the same for. The defendants also sold to one or two persons in Tolland county the right for that county, for $9,500, which was, in a very short time, resold to the Tolland County Peat Company, for the sum of $35,000. Corporations were organized for the manufacture of peat fuel, in various places in the state, in a number of which works were erected and equipped with sheds, steam engines, tramways, crates, &c., for the successful prosecution of the business. The capital stock of these corporations ranged from $25,000 to $100,000. Peat morasses suddenly assumed a new value, and swamps which had hitherto been left in the undisturbed possession of frogs and turtles, were about to prove equivalent to coal mines, and to become sources of great profit to those who should work them. It was under the influence of this delusion that most of the facts enumerated in the finding of this court in the present case occurred. Justice to both parties requires this brief statement of the condition of things at the time, in view of the fact that not only has no money been made in the business, but thousands of dollars have been lost in demonstrating that none could be made by the use of this machinery, in the present state of practical knowledge on the subject, in Connecticut. The whole thing in this state seems to have been abandoned as a failure, after repeated experiments, by which the cost of manufacture has been proved to greatly exceed the value of the article produced.

The legal questions arising out of the finding of the court can be easily disposed of. The charges of fraud and conspiracy are negatived. The allegation of total failure of consideration is also negatived. Though the value of the patent right was grossly exaggerated, yet it had, in the hands of the defendants, at least a market value, as is proved by their sales and the sales of others. There is, also, some little evidence tending to show that those thoroughly acquainted, by experience, with the working of peat into fuel, may derive some advantage from the use of this machine, when it is employ-

ed under the most favorable circumstances. There is, therefore, a consideration to support the contract.

The question of warranty was discussed at length on the argument, but it is sufficient to say that, assuming that the representations made by the plaintiffs amounted to warranties, they were, by the terms of the contract, conditional and limited. The trial was to be made in ninety days from the date of the contract, and the defendants made that trial in such manner as they saw fit. If they were dissatisfied with the result, they should have notified the plaintiffs, or at least ceased to proceed any further in the execution of the contract. Instead of that, they continued their experiments, received, without objection, the transfer of the right, which they never tendered back, and, even after a majority of the directors had knowledge, in August, 1866, that the first $12,500 had been overpaid, through their secretary, in cash and a note of the company payable on demand, they took no steps to disavow his acts to the plaintiffs. At least, they are fairly chargeable with this knowledge, for they had then discovered that the president and secretary had delivered a large amount of notes to the plaintiffs, besides the cash payments which had been made, and that the secretary, as they supposed, had endorsed notes to the amount of $25,000 more, or thereabouts, in which the company had no real interest. They were, therefore put on enquiry, and it would be imputing to them gross negligence and inattention to their own interests, which were involved in the interests of the company, not to assume that they made themselves acquainted, at that time, with the financial condition of the latter. It may seem strange that, with the result of their experiments before them, they did not then endeavor to revoke their contract, or relieve themselves from any further obligations under it. But, perhaps, a solution of this mystery may be found in the remark of one of the directors on this trial, who testified, in answer to the question put by the court, why they did not take immediate steps to disavow the acts of their secretary, and repudiate the contract, that "they did not wish to make a noise, as they were selling rights, and must keep up appearances." The defendants must, therefore, in judgment of law, be deemed to have accepted the result of their trial of the machine, as a fulfilment of the promises implied in the conditional guaranties of the contract. They not only paid large sums on the contract after the ninety days had expired, but were in the market with rights for sale, and, on the 13th of August, received from the plaintiffs the final transfer of the patent, as provided for by the contract. True, it appears that the defendants did not fully realize their condi-

tion till near the last of August, but, even then, when they had ascertained the state of affairs, they made no attempt to rescind the contract, or relieve themselves from its obligations. From the facts formally found by the court, the deduction is irresistible, that they accepted the contract as fulfilled on the part of the plaintiffs. The law can put no other construction upon their acts. They are, therefore, legally bound to pay the $2,251 found by the court to be due on the first $12,500. The plaintiffs must, therefore, recover to that extent on the note for $2,251.

The note for $5,000 stands upon different ground. This was given by the Tolland County Peat Company to the defendants, payable to their order. It was endorsed by Ranney as president, and by him only. According to the by-laws of the defendants, this note could only be endorsed by the secretary; and the plaintiff Leavitt, as a director of the company at the time he received the note from Ranney, is chargeable with knowledge of the fact that it was not endorsed by the defendants, or by their authority, and his co-plaintiff is chargeable with this knowledge of his co-partner. This attempt of Ranney to endorse the paper of the company was not known to the defendants till this trial. They have, therefore, never ratified his act. It follows, that the plaintiff has no legal title to this note, and cannot subject the defendants as endorsers thereon.

Neither can the plaintiffs recover the amount of the note, or any portion of it, under the count for money had and received, the only one appropriate to the claim made. There is nothing due to them for cash received by the defendants, either for territorial rights sold, or for "profits accruing from the development of this enterprise." They have paid over one-half of the cash received for rights, and there are no profits. If the note were cash in the hands of the defendants, the plaintiffs would be entitled to only one-half of the amount, by the terms of the contract. But it is not cash, and neither the directors of the company nor the plaintiffs have any right to treat it as cash. Whether this note is collectable by the defendants, and it is, therefore, their duty to enforce its collection, does not appear clearly, and cannot be determined in this suit.

The claim of $800 for the machines alleged to have been delivered to Lewis, on the order of the defendants, is rejected. It was not put in evidence by the plaintiffs in their original proofs. Besides, if the sale to Lewis was made on the order of the defendants, the plaintiffs have revoked that sale, and set up their own title to the machines. Let judgment be entered for the plaintiffs, to recover the sum of $2,492.94, with costs.